By the Court.—Sanford, J.
—It is strenuously insisted, on the part of the appellants, that the alleged agreement between the parties to this action, for the breach of which a recovery has been had, contravenes public policy, and is, therefore, illegal and void. A careful examination of the pleadings and proofs has failed to convince me that there was anything either in the combination and concert of action between the parties, which preceded the election of April, 1875, or in the agreement between them, which, in furtherance of the objects and purposes then had in view, is claimed by the plaintiffs to have been made in November following, that can justly be deemed obnoxious to criticism, as contravening the policy of the law. Divested of irrelevant matter not essential to the cause of action therein stated, the allegations of the complaint are to the effect, that during and prior to the month of April, 1875, the plaintiffs, as administrators of Albert Havemeyer, deceased, held and owned eleven thousand one hundred and ninety-six shares of the capital stock of the Long Island Railroad Company ; that the defend *509 ants, at the same time, assumed to own and control nine thousand seven hundred and seventy-six shares of such stock ; that in April, 1875, a board of directors was elected, of which the defendants were members; that the defendant, Henry Havemeyer, was thereupon made president, and the defendant, John C. ■ Havemeyer, a member of the executive committee of the board; that the practical direction, management and control of the company and its affairs, were thus transferred to the defendants ; that such election and transfer were brought about under and in pursuance of a combination between plaintiffs and defendants, the object of which was to effect a sale of the stock held or controlled by both, and, in the mean time, until such sale, to secure the election of directors, who would manage the company’s affairs in the interest of its stockholders, and thus improve the value of the stock ; that the defendants proposed to nominate all the members of the new board except two ; that by way of inducement to such combination, they disavowed any intention of selling their stock, and promise^ that no such action should be taken by them; that upon defendants’ assurances to this effect, and upon their promise of good faith in securing the objects proposed to be attained as above stated, it was agreed between the parties that their stock should be combined for that purpose ; that, prior to such election, negotiations were pending between the plaintiffs and one Poppenhusen, who owned or-controlled competing and parallel lines of railway, for the sale to him of the stock held by both plaintiffs and defendants, together with such other stock as should seem suitable ; that in November,.1875, the plaintiffs secured definite proposals from Poppenhusen for a purchase ; that it was thereupon agreed by and between the parties, in furtherance of the agreement which had previously been made, that both parties should unite to effect a sale to Poppenhusen; *510 that neither should sell without the other; that the negotiations should be conducted by the plaintiffs, and that the defendants should aid by obtaining the union of other holders, so as to include all persons whom they stated they wished to join, and to combine such number of shares as Poppenhusen was willing to purchase ; that the plaintiffs’ negotiations for a sale were continued until December 18, 1875, when the defendants refused to join with them in any sale, but subsequently, and on or about January 26, 1876, did sell to Poppenhusen, including their own, and that of other persons, about thirty-five thousand shares of stock, at seventy-five per cent, of the par value thereof, leaving out the stock of the plaintiffs ; that while thus professing to co-operate with the plaintiffs, and so preventing them from acting independently to effect a sale, the defendants arranged with other stockholders, with whom they had undertaken to communicate for the common benefit, so as individually to represent their stock; that they also bought stock of other parties, and thus secured the control of a majority of the stock, exclusive of the plaintiffs, and thereupon used their own stock, together with that thus acquired, to defeat a sale which should include the plaintiffs, and accomplish a sale which should include their purchased stock, leaving the plaintiffs out, and so causing to them the injury which it had .been the object of the transactions and agreements between the parties, to avoid ; that by such action on the part of the defendants, the plaintiffs’ stock has been depreciated from seventy-five' per cent, of its par value, to not more than forty per cent, thereof, and that for such depreciation, the defendants are liable; that of the stock held by plaintiffs, four thousand two hundred and forty-one shares belonged to themselves absolutely, and that the residue, with the knowledge of defendants, was, prior to the agreement made in November, distributed among the next *511 of kin of Albert Havemeyer, for whom subsequently to such distribution the plaintiffs continued to act.
For the damage to themselves, as owners of such four thousand two hundred and forty one shares, the plaintiffs claim judgment.
The defendants by their respective answers to the complaint, put in issue most of the averments thereof, and, particularly, deny that there was any combination between the parties, prior to the election of directors in April, 1875, the object of which was to effect a sale of the stock for the common benefit of both parties, or for any other purpose than to secure the election of directors who would manage the company’s affairs in the interest of the stockholders, and thus improve the value of the stock. For that purpose, the defendant, John C. Havemeyer, admits, in terms, that there was a combination and concert of action between the parties as alleged in the complaint. Both defendants admit by their answers that in November, 1875, it was agreed between plaintiffs and defendants, that, during a limited period, neither party should make, or agree to make, any sale of stock without the concurrence and participation of the other; but both defendants aver, that, before December 15, 1875, such agreement terminated and expired, and that the mutual obligations arising therefrom wholly ceased.
The sale by defendants to Poppenhusen of the stock held by themselves and other parties, exclusive of the plaintiffs, to the amount of thirty-five thousand shares or thereabouts, at the rate of seventy-five per cent, of the par value thereof, is not disputed by either defendant.
Upon the pleadings, therefore, the only material averments as to any agreement for a combination or concert of action between the parties, prior to the election in April, 1875, are to the effect, that, with a view to an ultimate sale, they agreed to combine their stock *512 for the purpose of effecting a change in the administration of the company’s affairs by securing the election of honest directors who would manage them in the interest of the stockholders, and thus increase the value of their stock ; that the defendants insisted, as a condition of such combination, that they should nominate all the directors to be elected except two, and assured the plaintiffs that they had no intention of selling and would not sell their stock. At the trial the only evidence on the part of the plaintiffs in support of these averments was that of Henry O. Havemeyer, who testified in substance, that it was arranged before the election, that the stock of the parties should be combined, and not sold until after the election, when there would be an opportunity of determining whether, and under what circumstances a sale should be made. The stock was to be united with the view of ousting the managers who then had control, and “so that a sale might be made, if we desired, at some future date.” It was understood that the management should be-placed in the hands of the defendants, but that the plaintiffs should be represented in the board by three directors of their own selection. He also testified that at the ensuing election in April, 1875, this arrangement was consummated. The former management was ousted and a new board was elected, as arranged.
I am unable to perceive anything in this 'combination, or in the agreement therefor, which tends to defeat the rights of stockholders generally, or the interests of the public at- large, as defined by that provision of the revised statutes which declares that the directors of railroad corporations “shall be chosen annually by the majority of the votes of the stockholders voting at such elections.” Practically, the selection of candidates must precede an election, and it would often be difficult, if not impossible, to make such selection without comparison of views, combina *513 tion, concession and concerted action. No formidable and effective opposition to an existing board, however obnoxious, could be organized without combination. An agreement to combine stock for the purpose of terminating mismanagement by a change in the direction through the instrumentality of a majority of votes, at a regular election, is not in conflict with the requirements of the. law, and in no wise derogates from its policy.
The well-established principles of law which have been invoked by the learned counsel for the defendants are not at variance with this view. They are intended to protect the public and the stockholders of corporations, from combinations whose object is to corrupt official action, and to preclude control by the majority in interest. They are applicable to cases in which one of the parties stipulates to accord or secure to the other, for a consideration, some private or personal advantage not shared by the stockholders at large. Nothing of that kind appears to have been contemplated by the combination now in question. Its object was to stop mismanagement by the election of an honest board, who would manage the corporation in the interest of its members and so as to improve the value of their stock. No other advantage was to accrue to any one concerned than such as would be common to all; and, as the combination contemplated the sanction and approval of a majority of the stockholders voting at the election, there was nothing in it which directly or indirectly tended to frustrate or interfere with the legal right of such majority to delegate to directors of its own choosing the management of the company’s affairs.
"In Fremont v. Stone (42 Barb. 170), the defendants had stipulated with the plaintiff that on the payment by him of a certain sum as the price of sundry shares of stock then belonging to them, a change should be *514 effected in the direction of the company of which they were members, at the dictation, and in the interest of the plaintiff and his co-purchaser, through the contrivance of the defendants, and not by the votes of the stockholders at large. The action was brought for a specific performance of the contract of sale, and it was held that such contract, by reason of its purpose, was contrary to public policy and void. So in Guernsey v. Cook (120 Mass. 501), where the conditions of a contract for the sale of stock were that the vendor should secure to the purchaser, the office of treasurer to the corporation, with a salary, and, in case of his removal from office, should repurchase the stock, it was held that the contract was void as against public policy, in the absence of evidence that the contract was not for the private benefit of the stockholder, or that it was consented to by the other members of the corporation. The case of Card v. Hope (2 B. & C. 661), involves substantially the same principle. • It is the principle affirmed in the familiar maxim, “Me turpi contractu, non oritur actio.” That maxim has no applicability to a contract or combination for united action, on the part of members of a corporation, whose object is to put an end to a dishonest or culpable management, and to replace it by one which will conduct the corporate business in the interest of all the stockholders, and particularly if such contract or combination contemplates, and can only have effect by virtue of, its ratification by the votes of a majority of stockholders at a regular annual election. The first combination or agreement alleged in the complaint appears to have been made for the purpose of effecting such a change. The change was to be effected by no contrivance or device on the part of either party, but simply through the ordinary and legitimate machinery of a regular election. No private or personal advantage was to inure to either of the contracting parties. They con *515 templat-ed, indeed, an improvement in the value- of their stock, and had in view, as an ulterior object, a possible sale on more advantageous terms when such improvement should have been attained. But every other stockholder would participate with them, in the , realization of these anticipations, and their action in effecting the combination, or in voting pursuant to it, could therefore in no wise be vitiated thereby. I am of opinion, that the arrangement was contaminated by no illegality, and that, in so far as it formed the basis of the subsequent agreement alleged to have been made in November following, it imparted thereto no element of invalidity.
The agreement of November, 1875, is impugned, mainly, as connected with, and growing out of, the original combination already considered, and therefore as equally tainted with the illegality, which, it is said, affected that transaction. This objection is disposed of by the views already expressed. But it is further urged that the contract is inherently invalid, because made with the intent to transfer the Long Island railroad to a rival railway company, and thus to consolidate competing lines, and prevent competition. The mere fact that Poppenhusen was largely interested in competing lines, does not seem to me to constitute sufficient ground for avoiding a contract between stockholders of the Long Island ¡Railroad Company, to unite their stock with that of other parties for the purpose of effecting its sale to him; even though the purpose and necessary effect of such sale should be to vest him with a majority of the stock, and hence with a controlling interest in the management of that company. There is no legal limitation upon the right of an individual to acquire any number of shares of stock in any number of corporations, whether their business be competitive or otherwise; nor is it to be presumed that one holding a controlling interest in more than one such *516 corporation will so guide or control the affairs of either as to prejudice his associates therein, for the purpose of promoting his own advantage in connection with the others. Neither the pleadings nor the proofs in this case warrant the inference that the alleged contract between the parties to. combine their stock for the purpose- of effecting its sale to Pbppenhusen, was entered into for the purpose, or with the intent, of enabling him to do an illegal act; nor can it be inferred that any illegal act was contemplated by him, from the mere fact that he desired to purchase such an amount of stock as would secure , to him a controlling interest. The remedies properly applicable to breaches of official duty and trust, are amply sufficient for the protection of the public against merely possible, or even probable, violations thereof; and the policy of the law is not invaded-by a contract, upon whose performance a wrong may be perpetrated, unless, it be the purpose and intent of the parties concerned that such shall be its •actual' effect (O’Brien v. Brietenbach, 1 Hilt. 304). No such illegal purpose or intent is established, nor can such be inferred from the evidence in this case. The judgment appealed from cannot therefore be impeached for error on the part of the court in refusing to dismiss the complaint, or to direct a verdict for the defendants on the ground that the compact between the parties, as 'alleged and proved, was void as in contravention of ‘public policy and law.
I am further of opinion, that the contract between the parties involved no infraction of the requirements of law relating to the restraint of trade, and was not opposed to the policy of the law, as restricting the right of alienation. But I deem it unnecessary to discuss these points at length. The decision of the ease must turn upon other questions involved, the correct solution of which is fatal to the maintenance of the judgment.
The measure of damages for a breach by the defend *517 ants of their contract not to sell their own stock except in connection with that of the plaintiffs, would be the amount of any depreciation in the fair cash market value of the plaintiffs’ stock, occasioned by such breach. Such would seem to have been the understanding of the judge at the trial, but the rule of damage adopted by him, and stated in general terms to the jury in his charge, although substantially correct, and in accordance with this view, was afterward so modified by an assumption as to the value of the stock at the time of the breach, as substantially to withdraw from the jury any discretion as to the determination of that element in the assessment they were required to make.
The court charged that the plaintiffs claimed, among other things, as the result of the sale by defendants to Poppenhusen, a depreciation in the value of their stock from seventy-five cents on the dollar, which would have been obtained for it if defendants had kept their agreement, to thirty or forty cents on the dollar ; and that if the jury found the facts to be as claimed by the plaintiffs, they were entitled to recover the difference between the value which the stock would have had if the defendants had kept their agreement, and the amount to which its value was reduced by the action of the defendants, with interest. “The claim made by the plaintiffs,” he added, “is for the difference between four thousand two hundred and forty-one shares at seventy-five cents, amounting to $159,-037.50, and the same number of shares at forty cents, amounting to $84,820 ; leaving a balance of $74,217.50, with interest from January 26, 1876, to date, amounting to $6,494.03, being a total of $80,711.53, which the plaintiff’s claim to recover.” He then, in substance, directed the jury from the evidence in respect to the price paid by Poppenhusen on the sale to him by defendants, and the evidence of the witnesses as to the *518 value of the stock after such sale, to determine the value of the stock at the time of the sale, and in view of the evidence and the instructions given them, to assess the damages which they considered the plaintiffs entitled to recover.
The fair purport and meaning of the learned judge, was that, in determining the value of the stock at the time of the breach by defendants, the jury were at liberty to consider the price paid by Poppenhusen as evidence tending to show its value at that time ; the question of such value, however, as well as that of the value subsequently, being one for their consideration, and not, in any sense, one to be determined by the court. The charge, however, was not thus interpreted by the defendants’ counsel, as appears from the form of their exception. They excepted to the conclusion “ that the plaintiffs are entitled to recover the difference between seventy-five per cent, and thirty or thirty-five per cent.”
As the charge of the court, as delivered, embodied no such conclusion, the exception would have been untenable but for what followed. In response to such exception, the court added: “The difference between seventy-five and such sum as the jury find to have been the value of the stock,” thus correcting the error of the counsel in assuming that the court had fixed upon thirty or thirty-five cents, as the value of the stock after the sale, but adopting and confirming that error, with respect to its previous value, and thus leaving the jury to understand that they were not at liberty to ascertain or compute the depreciation upon any other' basis than that of seventy-five cents on the dollar, as the value of the stock at the time when the sale was made. To this last proposition exception was duly taken, and as it may justly be inferred that the jury were misled thereby, I am of opinion that their verdict should not be upheld. While the evidence as to the price paid by Poppenhusen might have justified a *519 finding that the plaintiffs’ stock would have realized seventy-five, but for defendants’ action, it was not conclusive. There was other evidence upon the same point. Mr. Kobert L. Cutting, a witness for the plaintiffs, testified that, during the year 1875, and prior to the sale to Poppenhusen, the market value of the stock was about fifty. It appeared that the defendants had made large purchases shortly before the sale at sixty. 'There was no evidence that the plaintiffs could have obtained seventy-five cents on the dollar for their stock, except by combining it with that of the defendants, and, with such additional stock, constituting a majority of the whole, as the defendants should be able to control.
The only evidence tending to show that seventy-five cents could have ever been obtained by them under any circumstances is tobe found in the fact that the defendants did obtain that price by securing and combining, with the stock originally held by them, an additional amount, sufficient to constitute, with their own, a majority or controlling interest.
Moreover, a sale of bonds at ninety per cent, formed one of the elements and conditions of such sale, and it does not appear how far the nominal price of the stock may have been influenced and affected by the price or value of such bonds. The sale was an entirety. It cannot be assumed that the price of the stock was unaffected by that of the bonds, or would have been paid had no such bonds been sold.
It was for the jury, therefore, under all the circumstances, and upon all the evidence, to determine the fair value of the plaintiffs’ stock, and the price that could have been obtained for it, at the time of the sale to Poppenhusen, but for defendants’ breach; and as the court finally left them no discretion on this point, but fixed such value absolutely, at seventy-five cents on the dollar, there was error for which the judgment *520 should be reversed. That error was aggravated by the omission to confine the inquiry as so the amount of depreciation in the market value of the stock subsequently to the sale, to a reasonable period thereafter; but as this objection does not appear to have been specifically called to the attention of the judge at the trial, when exception was taken to his ruling in adiniting evidence as to such market value, it should not be deemed entitled to weight in the determination of the present appeal.
Another exception to a ruling of the court in admitting evidence, to which objection was made on behalf of defendants, is of serious character. One Waterbary, a witness for the plaintiffs, was permitted to tes.tify, under objection, that an interview occurred between himself and the defendant Henry Havemeyer, in which the latter proposed to him to make a combination of their stock, and “not to sell, one without the other.” It is true that the objection was not made until after the witness had testified to the fact that such a proposal was made to him by one of the defendants. He had stated that one of them had an interview with him in the fore part of April, after the election, and the following question was thereupon put to him. Q. What was said between you .then 3 To this question, no objection was interposed, nor would an objection, if made, have been tenable. Any admission by either of the defendants, material to the controversy and bearing legitimately upon the issues to be tried, would have been admissible in evidence, and such an admission, if made, would have been elicited by the question. It could not be known, until the question was answered, whether or not the response 'would be relevant or material. The answer was im.mediately followed by the inquiry, “Which of the defendant? proposed that 3” The objection was then *521 taken, that it was quite immaterial what bargain either defendant proposed to make with this witness. The objection was overruled; defendant’s counsel excepted, and the witness answered, “Mr. Henry Havemeyer.” I am of opinion that the objection was taken in time, and that the evidence should have been excluded. The evidence directly tending to connect Henry Havemeyer with the whole transaction was but slight, and the jury might naturally draw inferences adverse to both the defendants, and certainly to him, from the fact that he had been desirous of entering into engagements with others, similar in character to that, the existence or continuance of which, at a particular time, between the parties, constituted one of the most important issues to be tried. The evidence was res inter alios acta, and ought not to have been considered by the jury as bearing upon the issues submitted to them. Its admission, after objection, may well be supposed to have been regarded by them as involving an intimation from the court that it was competent and relevant, and might tend to establish the plaintiffs’ case.
While the erroneous admission of irrelevant evidence ought not to be regarded as constituting sufficient ground for reversal, if it be clear that it was wholly innocuous and could not have affected the result (Rowland v. Hegeman, 59 N. Y. 643; Downs v. N. Y. Central Railroad Co., 56 Id. 664), the legal intendment always is, as stated by Allen, J., in Coleman v. The People (59 N. Y. 555), that such an error is prejudicial to the party objecting. That intendment must be clearly repelled, and the error shown to be harmless, in order to justify its disregard by an appellate court. I am by no means satisfied that the jury were not influenced by this evidence, and that it did not in some degree prejudice the defendants. It is impossible to say that it did not tend to “ awaken the *522 sympathies, and warp and influence the judgments of the jurors to some degree.” The cases of Anderson v. Rome, Watertown & Ogdensburgh R. R. Co. (54 N. Y. 334), and Baird v. Gillet (47 N. Y. 186), are conclusive against disregarding, on appeal, the erroneous admission of incompetent and illegal evidence, unless it is clear, beyond rational doubt, that the result was not, and could not have been, affected thereby. The admission of the evidence, notwithstanding the.objection of the defendants, was tantamount to an instruction to the jury that they were authorized to consider it, in arriving at a conclusion as to the merits of the controversy, and the presumption is that they did. There is nothing in the case to repel that presumption, and the authorities are numerous for directing the reversal of judgments, where evidence far less objectionable has been erroneously received.
It is unnecessary, and perhaps undesirable, to pass upon other questions raised by this appeal.
My conclusion is, that the judgment and order appealed from should be reversed and a new trial ordered, with costs to the appellants to abide the event.
Freedman, J., concurred.